UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

ROBERT KATULA,

      Plaintiff,

                                Civil Action No. 2:23-cv-2199
v.                             JUDGE EDMUND A. SARGUS, JR.
                                Magistrate Judge Kimberly A. Jolson

DELAWARE COUNTY BOARD
OF ELECTIONS, *et al.*,

      Defendants.

## OPINION AND ORDER

This matter is before the Court on Defendants Delaware County Board of Elections and Peg Watkins's Motion for Judgment on the Pleadings. (Mot., ECF No. 13.) For the reasons stated below, the Court **DENIES** Defendants' Motion.

## BACKGROUND

This case arises from Plaintiff Robert Katula's termination from the Delaware County Board of Elections (the "Board"). While Defendants dispute Katula's allegations, the Court must take Katula's factual allegations as true at this stage of the case. The primary dispute in the case, and a dispositive issue for the pending Motion, is the nature of Katula's position. The Court first summarizes the nature of Katula's role, then recounts his termination.

### I.    Katula's Employment

Katula was employed by the Board as an "election specialist." (Am. Compl. ECF No. 9, ¶ 8.) Katula contends that his role as an election specialist was merely "administrative" and required the "impartial" assignment of poll workers, and thus did not require subscription to a political ideology. (*Id*. at ¶¶ 9–10.) Defendants, instead, assert that Katula was hired as a "Democratic

1

Election Specialist," a position the Board classifies as one that is filled "by balancing out political representation." (Answer, ECF No. 12, ¶¶ 5, 6.)

According to Defendants, "Election Support Specialists are hired based on partisan affiliation to effectively comply with Ohio law regarding responsibilities of election officials which must require employees of opposite political parties to perform the same function at the same time." (*Id*. at ¶ 6.) In support of this contention, Defendants provided meeting minutes for the hiring of Katula as a "Democratic worke[r]" (Answer, Ex. A, ECF No. 12-1, at PageID # 80), and for the hiring of a "part time Republican Election Support Specialist." (ECF No. 12-2, Ex. B, at PageID # 83.) Defendants suggest that these meeting records demonstrate that Katula and "his Republican counterparts" were hired "based on their partisan affiliation." (Defs. Mot., ECF No. 13, at PageID # 97.) Moreover, Defendants stated that partisan affiliation is an "essential requirement" of the election specialist position (Answer, ECF No. 12, ¶ 23), and that they checked Katula's voter registration to ensure he was a Democrat. (*Id*. ¶ 6.)[1]

## II.     Katula's Politics and Termination

While Katula identifies as a "moderate" Democrat, he indicates that he had "grown frustrated" with the polarized nature of American politics. (Am. Compl. ¶¶ 17, 25.) During his time working for the Board, he maintained an intimate relationship with a Republican. (*Id*. ¶ 20.) Watkins was aware of Katula's relationship (Answer, ECF No. 12, ¶ 15), and Katula alleges that Watkins had openly expressed disapproval. (Am. Compl., ECF No. 9, ¶ 21.) Katula states that he disagreed with Watkins' "extreme approach" and "far" left political leanings. (*Id*. ¶¶ 18–20.) Nevertheless, the two continued to work together "without incident." (*Id*. ¶ 22.)

---

[1] Katula is a member of the Delaware County Democratic Party, of which Watkins is the chair. (*Id*. ¶¶ 14, 15.)

2

On the evening of April 6, 2023, outside of work hours, Katula took his political grievances online. (*Id.* ¶ 23.) He posted—on his Facebook page—that he was a "middle of the road, right leaning person" and that "[m]ost so-called progressives are in a box so small that they should be called little idealogues." (*Id.*) When Katula returned to work on April 10, he realized he no longer had access to the office and was escorted to meet with Watkins. (*Id.* ¶¶ 27, 28.) During this meeting, Watkins informed Katula that his post, along with other "prior statements," raised question of his party loyalty and he would be considered for termination as a result. (*Id.* ¶ 29; Answer, ECF No. 12, ¶ 22.) Katula was, indeed, terminated. Watkins alleges that she fired Katula based on his Facebook post and "prior statements suggesting a lack of loyalty to the Democratic Party," (Answer, ¶ 22) and not because of his relationship with a Republican. (*Id.* ¶ 35.)

Katula has filed a two-count complaint in this Court alleging a claim of First Amendment Retaliation in Violation of 42 U.S.C. § 1983 for his termination based on his Facebook post (Am. Compl., ECF No. 9, ¶¶ 34–40), and a Fourteenth Amendment Retaliation claim for his termination based on his protected intimate association with a Republican. (*Id.* ¶¶ 42–44.) Defendants moved for judgment on the pleadings on the two claims. (Mot., ECF No. 13.) Katula responded in opposition (Pl. Resp., ECF No. 14), and Defendants replied (Reply, ECF No. 15.)

## STANDARD OF REVIEW

The Federal Rules of Civil Procedure provide that, "after the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). The standard of review for a Rule 12(c) motion for judgment on the pleadings is identical to the standard for a motion to dismiss under Rule 12(b)(6). *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 295 (6th Cir. 2008). To state a claim upon which relief may be granted, plaintiffs must satisfy the pleading requirements set forth in Rule 8(a). While Rule 8(a)(2) requires

3

a pleading to contain a "short and plain statement of the claim showing that the pleader is entitled to relief," in order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 677–78 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (clarifying the plausibility standard articulated in *Twombly*). Furthermore, "[a]lthough for purposes of a motion to dismiss [a court] must take all the factual allegations in the complaint as true, [it][is] not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 677–79 (quoting *Twombly*, 550 U.S. at 55) (internal quotations omitted).

## ANALYSIS

Because determining whether Watkins is entitled to qualified immunity necessarily overlaps with determining whether Katula has pled plausible First and Fourteenth Amendment claims, the Court will address (I) Katula's First Amendment claim; (II) Katula's Fourteenth Amendment claim; and then (III) whether Watkins is entitled to qualified immunity.

**I. Katula's First Amendment Retaliation Claim**

First Amendment retaliation claims under § 1983 require a plaintiff to show (1) that his speech was constitutionally protected, (2) he was subject to "adverse action or was deprived of some benefit," and (3) the protected speech was a "substantial" or "motivating factor" for the adverse action. *Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 897 (6th Cir. 2001) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). Public employees face additional hurdles to show their speech was constitutionally protected. As a public employee, Katula must demonstrate that (1) he was speaking as a private citizen, (2) on a matter of public

4

concern, and (3) his interest in commenting on the matter outweighed the state's interest as an employer. *Westmoreland v. Sutherland*, 662 F.3d 714, 718–19 (6th Cir. 2011) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006)).

Under the third element's balancing requirement, the balance favors the government as a matter of law where the discharge of a policymaking employee is related to his political or policy views. *Rose v. Stephens*, 291 F.3d 917, 923 (6th Cir. 2002) (the "*Rose* presumption"). For the *Rose* presumption to apply in the government's favor, the plaintiff must (1) have held a policymaking position and (2) have spoken "on a matter related to political or policy views." *Dixon v. Univ. of Toledo*, 702 F.3d 269, 275 (6th Cir. 2012). While the parties dispute whether Katula was speaking as a private citizen or that the speech was a matter of public concern, the crux of the issue is the classification and nature of Katula's position. If it was a policymaking position, the balance would tip in Defendants' favor as a matter of law.

Given the extensive rules governing First Amendment claims for public employees, the Court first discusses the applicable law for determining whether an employee holds a policymaking position. Second, the Court applies the law to Katula's claim.

### A. The *Branti* Exception for Policymaking Employees

Dismissals based on an individual's political party are generally unconstitutional unless partisan affiliation is an appropriate requirement of the position. *Caudill v. Hollan*, 431 F.3d 900, 908 (6th Cir. 2005) (discussing the "*Branti* exception" and citing *Branti v. Finkel*, 445 U.S. 507 (1980)). In creating the *Branti* exception, the Supreme Court held that a plaintiff must first make a prima facie case that his dismissal was due to his political affiliation. *Branti*, 445 U.S. at 517. If so, the burden shifts to the defendant to show that the plaintiff's job was a "policymaking position," and thus a patronage dismissal was constitutional. *Id.* at 517–18. A position falling under the *Branti* exception is thus shielded from constitutional scrutiny with respect to partisan-

5

based dismissals. Moreover, the Sixth Circuit has held that the discharge of a policymaking public employee "on the basis of speech related to his political or policy views" is presumptively constitutional. *Rose*, 291 F.3d at 921. However, defendants have the burden under *Branti* to demonstrate that Katula's position was a "policymaking" position as a matter of law.

The Sixth Circuit has held that, to determine whether a job constitutes a "policymaking" position, the ultimate inquiry is not whether a position may be appropriately labelled as involving "policymaking," but rather whether the hiring authority can "demonstrate that party affiliation is an *appropriate requirement* for the effective performance of the public office involved." *Lane v. City of Lafollette*, 490 F.3d 410, 419 (6th Cir. 2007) (quoting *Branti*, 445 U.S. at 518). The inquiry focuses on the "inherent duties" of the position, and not on the position as it was performed by the plaintiff. *Id*. (citing *Faughender v. City of N. Olmstead*, 927 F.2d 909, 913 (6th Cir. 1991)). Whether political affiliation is an "appropriate" consideration for the position is a question of law. *Sowards v. Loudon Cnty.*, 203 F.3d 426, 435 (6th Cir. 2000); *see also Rice v. Ohio Dept. of Transp.*, 14 F.3d 1133, 1142 (6th Cir. 1994) ("[T]he test is not whether party affiliation and support are *essential* to the effective performance of the public office involved; the test, under *Branti*, is whether these are 'appropriate' requirements."). While this is a matter of law, the inquiry is governed by the "nature of the responsibilities" and must be made on a case-by-case basis. *Peterson v. Dean*, 777 F.3d 334, 341–42 (6th Cir. 2015). A court must thus "look beyond the mere job title and examine the inherent duties of the position at issue." *Id*. at 342 (citing *Lane*, 490 F.3d at 419).

To aid in its "policymaking" analysis, the Sixth Circuit elucidated four categories of government employment within the scope of the *Branti* exception. *McCloud v. Testa*, 97 F. 3d 1536, 1557 (6th Cir. 1996). The four *McCloud* categories are:

6

>**Category One:** positions specifically named in relevant federal, state, county, or municipal law to which discretionary authority with respect to the enforcement of that law or the carrying out of some other policy of political concern is granted[];
>
>**Category Two:** positions to which a significant portion of the total discretionary authority available to category one position-holders has been delegated; or positions not named in law, possessing by virtue of the jurisdiction's pattern or practice the same quantum or type of discretionary authority commonly held by category one positions in other jurisdictions[];
>
>**Category Three:** confidential advisors who spend a significant portion of their time on the job advising category one or category two position-holders on how to exercise their statutory or delegated policymaking authority, or other confidential employees who control the lines of communications to category one positions, category two positions or confidential advisors[];
>
>**Category Four:** positions that are part of a group of positions filled by balancing out political party representation, or that are filled by balancing out selections made by different governmental agents or bodies[].

*Id*. at 1557 (footnotes omitted). Each of these categories were derived from the reasoning in *Branti* and sought to cover specific examples. The Sixth Circuit stated that category four, for example, was "formulated to accommodate the example given in *Branti* that an election judge could be dismissed without violating the First Amendment where state law requires that one election judge be a Democrat and the other a Republican." *Id.* (citing *Branti*, 445 U.S. at 518). The *McCloud* court gave its own illustrative examples, including the following for a category four position:

>[A] gubernatorially-appointed Democratic economist placed on a revenue forecasting committee consisting by law of two economists (one Republican and one Democrat) chosen by the state legislature, two economists of similar party affiliation chosen by the governor, and one economist of any party chosen by the president of the state's most prominent university.

*Id.* at 1557–58.

The employee's position, however, is not required to fit neatly into one of the four categories to be considered "policymaking" under the *Branti* exception. *Feeney v. Shipley*, 164 F.3d 311, 318 (6th Cir. 1999). The "touchstone" of a court's *Branti* inquiry is whether the hiring party can show that partisan affiliation is "an appropriate requirement for the effective

7

performance" of the position. *Libertarian Party of Ohio v. Wilhelm*, 988 F.3d 274, 281 (6th Cir. 2021) (quoting *Branti*, 445 U.S. at 518). Furthermore, if a position is ambiguous with respect to whether it falls into one of the four categories, the ambiguity must be construed in favor of the governmental defendants when the position is unclassified or non-merit under state law. *McCloud*, 97 F.3d at 1557 (citing *Rice*, 14 F.3d at 1143).

Bare assertions that political membership is essential to job performance is insufficient to carry the government's burden to demonstrate that partisan affiliation is an appropriate requirement for the position. *See id.* at 1558. Where the evidence offered by the governmental defendants is insufficient to show the inherent duties of the position, the Sixth Circuit has found summary judgment or qualified immunity inappropriate as a matter of law. *See e.g.*, *Caudill v. Hollan*, 431 F.3d 900, 910 (6th Cir. 2005) (holding that where defendant could not show that a deputy county clerk position fell under any of the *McCloud* categories, dismissal of a clerk position with routine duties for political affiliation was a constitutional violation); *Lane v. City of Lafollette*, 490 F.3d 410, 420–22 (6th Cir. 2007) (holding summary judgment was inappropriate where the record "disclose[d] neither the inherent duties of the [plaintiff's former position], nor the duties of the position as envisioned by Defendants," thus defendants failed to demonstrate political affiliation was an appropriate requirement for the position as a matter of law).

In *McCloud*, the Sixth Circuit affirmed the district court's denial of qualified immunity because it found the duties of McCloud's position as a staff attorney unclear. 97 F.3d at 1560. Citing the "barren record" before the court without any "helpful state or county law" to help discern the requirements of the position, the court held that it simply could not conclude that the defendant was entitled to qualified immunity as a matter of law. *Id.* at 1561 (citing "uncertainties about the

facts and the absence of any citations" to a governing statute).  Indeed, as the Sixth Circuit suggested:

> [When] a governmental employee may be nothing more than a supervisor with a glorified title who is simply performing functions over which he or she has no discretion, or no discretion of political significance, then this court cannot grant qualified immunity to a governmental defendant with respect to adverse employment actions taken against such lower-level public employees in an interlocutory appeal . . . .  In these circumstances, resolution of the qualified immunity issue will need to await further proceedings.

*Id*. at 1559.

Thus, where the inherent duties of the position are unclear from the record and there is no statutory provision that mandates partisan balancing, the government does not benefit from the favorable presumption.  Moreover, where statutory provisions or duties performed by the plaintiff do not suggest that partisan affiliation is an appropriate requirement, courts have found the *Branti* exception inapplicable.  *See e.g.*, *Sowards v. Loudon Cnty.*, 203 F.3d 426, 438 (6th Cir. 2000) (reversing the district court's grant of summary judgment to defendants, finding party affiliation was not an appropriate requirement of a county jailer, who by law was tasked with attending to the needs of inmates); *but see Peterson v. Dean*, 777 F.3d 334, 347 (6th Cir. 2015) ("[T]he fact that some duties of the administrator may be classified as 'ministerial' does not preclude the determination that other designated duties . . . are policymaking and inherently political tasks.").

B. **Whether Katula was employed in a "policymaking position"**

Considering these standards, the Court now turns to whether Katula's "election specialist" role is a policymaking position under *Branti*.  In reviewing the limited record before it, the Court cannot conclude that Katula was in a policymaking position at this juncture.

A dispositive issue for the Defendants' motion is whether Katula's "election specialist" position is subject to the *Branti* exception as a matter of law.  *Mumford v. Basinski*, 105 F.3d 264, 270–71 (6th Cir. 1997).  If Katula's position were classified as and continued to be viewed as a

9

policymaking position under *Branti*, then his First Amendment claim must fail. Likewise, if Katula's position is ambiguous with respect to its policymaking status, the ambiguity should be construed in favor of the Defendants. If, however, the position's status is unclear or the record cannot sufficiently establish that Katula's job is considered a policymaking position or a position filled to balance political representation, then judgment on the pleadings is inappropriate.

For Defendants to meet their burden of showing that Katula's position falls under the *Branti* exception, they must show either (1) that the inherent duties of the position are political in nature or that partisan affiliation is an appropriate requirement for the position; or (2) the legislature has delineated, by statute, that the particular position is political, in which case the *Rice* cannon requires judicial deference to the legislative determination. *See Caudill*, 431 F.3d at 909 (citing *Rice*, 14 F.3d at 1143).

Defendants argue that Katula's position may be classified as a "category four" position under *McCloud*. (Defs. Mot., ECF No. 13, at PageID # 97.) Defendants point to a recent Sixth Circuit decision to support their contention and argue that Katula could be terminated based on his policy-related speech. Citing *Schwamberger v. Marion County Board of Elections*, Defendants argue that Katula held a similar "policymaking" position and may properly be terminated for political affiliation. (*Id*. (quoting *Schwamberger v. Marion Cty. Bd. of Elections*, 988 F.3d 851, 857–59 (6th Cir. 2021)).) In *Schwamberger*, the Sixth Circuit affirmed dismissal of the plaintiff's complaint, finding that her position as a deputy director at the county board of elections fell under the category four *Branti* exception. 988 F.3d at 857. Unlike Katula's position, however, Ohio law required Ms. Schwamberger's deputy director position to include members of opposite political parties. *Id.* at 854–55 (citing R.C. § 3501.091 ("The director and deputy director shall be of opposite political parties.")). The court found four relevant sections of the Ohio Revised Code

that suggested the deputy director position was required to be filled through partisan balancing and could be terminated at the discretion of the board or the Secretary of State. *Id*. (citing R.C. §§ 3501.11(D), 3501.09, 3501.16). The court held that Ohio law made Ms. Schwamberger a policymaking employee under category four, and thus her speech related to the board's election policies was unprotected. *Id*. at 857.

Katula's position is less of a category four match. Defendants have not offered evidence that his position is required—by Ohio law—to be filled through partisan balancing, whereas Ohio law expressly required that Ms. Schwamberger's position be filled with a member of the opposing political party. Indeed, both Defendants and Katula agree there that there is "no such requirement" under Ohio law that mandates partisan balancing for Katula's position. (Pl. Resp., ECF No. 14, at PageID # 113; Defs. Reply, ECF No. 15, at PageID # 121.) Instead, Defendants contend that filling roles by partisan affiliation is a "necessary measure to comply" with state laws that "restrict the party membership of ballot workers performing certain tasks." (Reply, at PageID # 121.) Whether Katula ever performed these tasks or whether the Board contemplated him to perform such tasks is absent from the record.

Defendants' citation to Ohio law is unavailing. Defendants cite to several provisions of the Ohio Revised Code that require both the board and the directors to reflect political balancing, as well as those that require certain election procedures to be followed by "bipartisan teams of election officials," to suggest that partisan affiliation is an appropriate requirement of all Board employees. (Defs. Mot., ECF No. 13, at PageID # 99.) While the Sixth Circuit has held that "the entire operation of the election commission is a matter of political concern where the party in power is granted, by statute, control over the management of local elections in a manner that the major political party believes best comports with the requirements of the law," *Peterson v. Dean*,

11

777 F.3d 334, 349 (6th Cir. 2015), there is nothing in the Revised Code that requires *all* board employees be hired to balance partisan affiliation.

Defendants reference provisions such as R.C. 3509.05(C)(3)(d) and R.C. 3505.31 as support for the proposition that all county board of election employees are appointed to balance out party representation. (Mot., ECF No. 13, at PageID # 99.) Yet, the plain language of the statutory scheme suggests that only specified positions are required to be filled with an eye to political balancing. Defendants argue that any employee of a county board of elections is hired to balance out party representation because four provisions of the Revised Code have procedures that require bipartisan election officials. (*Id.*) However, even interpreting the statutory scheme as a whole, it is unclear from the statutes that all employees falling under the "election official" umbrella of R.C. 3501.01(U) are appointed to fulfill partisan balancing. (*Id.*); R.C. 3501.01(U)(3)-(8). That the language throughout the chapter makes specific reference to when a position requires partisan balancing undercuts Defendants' position. *See e.g.*, R.C. 3505.31 (requiring a voting location manager and a board employee to be of different political parties to deliver ballot containers); R.C. 3505.331(B)(3)(a) (requiring "bipartisan teams of election officials to physically examine and hand count randomly sampled ballots"); R.C. 3501.09 ("The director and deputy director shall be of opposite political parties"); R.C. 3501.16 ("vacancies in the office of chairperson, director, or deputy director shall be filled . . . from persons belonging to the same political party as that to which the outgoing officer belonged").

Nor does *McCloud* answer the question for this Court. Defendants argue that *McCloud* only requires that the position be "part of a group of positions filled by balancing out political party representation." (ECF No. 13, at PageID # 98.) Indeed, the *McCloud* court read the *Branti* exception broadly, holding that patronage dismissal is constitutionally permissible if the

government defendants can demonstrate that partisan affiliation is an appropriate qualification, even if the position does not fall neatly within one of the four categories. 97 F.3d at 1557. However, courts have not deferred to the government based on the invocation of a talismanic phrase, but rather have focused the inquiry on the underlying duties required of the position or legislative determinations on the nature of the position.

Nor does this Court read *McCloud* so broadly. The *McCloud* court specifically created category four as an example for judgeships "where *state law requires* that one election judge be a Democrat and the other a Republican." *McCloud*, 97 F.3d at 1557 (emphasis added) (citing *Branti*, 445 U.S. at 518). And the Sixth Circuit's own illustrative example contemplated roles where balancing was explicitly required by state law. *Id.* at 1557–58 (discussing positions where state law required the positions to be filled by political balancing). Thus, while *McCloud* described category four positions as those which are filled to balance out party representation, generally, all examples given involved state law requiring such balancing—circumstances which are absent here.

Despite Defendants' suggestion that the Board comprises partisan employees all the way down its ranks, the precise nature of Katula's position is unclear from the pleadings and statutes alone. Defendants have not suggested that Katula's position requires the kind of discretion central to the policymaking inquiry, and instead argue that whether Katula "served as a grunt or line worker" is "legally irrelevant." (Defs. Reply, ECF No. 15, at PageID # 120.) Under Defendants' interpretation of Sixth Circuit law, it is sufficient for the government to declare that the position is filled by balancing political party representation. (*Id.* at PageID # 121.) This misinterprets the Sixth Circuit's decisions, which do not merely take the governmental defendant's bare assertion that it hired an individual because of their partisan affiliation. *See e.g.*, *Lane v. City of Lafollette*,

13

490 F.3d 410, 420–22 (6th Cir. 2007); *McCloud*, 97 F. 3d at 1561. Indeed, while the Board may have made affiliation with the Democratic Party a requirement for Katula's position, it has not yet demonstrated that such requirement is *appropriate*. Nor have Defendants shown that Ohio law requires them to fill Katula's position to balance political party representation, as contemplated in *McCloud*.

As in *McCloud*, the "barren record" before the Court is insufficient to find that Katula's position falls under the *Branti* exception as a matter of law, and thus judgment on the pleadings on the First Amendment claim is inappropriate. For these reasons, the Court **DENIES** Defendants' Motion regarding Katula's First Amendment claim.

**II.      Katula's Fourteenth Amendment Retaliation Claim**

Defendants argue that Katula has failed to state a plausible Fourteenth Amendment claim. Specifically, Defendants argue that Katula has not plead a causal connection between his relationship with a Republican and his termination. (Defs. Mot., ECF No. 13, at PageID # 101.) The Court disagrees. First, the Court summarizes what Katula must plead to state a claim. Second, the Court applies this law to Katula's Amended Complaint. Construing all reasonable inferences in Katula's favor at this early stage of litigation, the Court finds he has adequately pleaded a claim for relief under the Fourteenth Amendment.

**A.      Substantial or Motivating Factor in the Adverse Action**

The Fourteenth Amendment protects a person's right to intimate association. *Hartwell v. Houghton Lake Community Schools*, 755 Fed. App'x 474, 476 (6th Cir. 2018).

In *Hartwell*, the Sixth Circuit outlined two trajectories of analysis at the early stages of a claim alleging retaliation in violation of the Fourteenth Amendment. *Id*. at 479 ("We always apply a tier of scrutiny to intimate-association cases when legitimate governmental interests at least

partially motivate a challenged government action. But sometimes we need not apply that framework in detail at the summary judgment stage because there is enough evidence for a reasonable jury to find that the only motivating factor was punishment."). Where there may be evidence for a reasonable jury to find that the only motivating factor for the adverse action was for punishment or "purely illegitimate reasons," the governing inquiry is an "isolated action" test. *Id.* The threshold inquiry for the Court is thus whether the claim challenges an existing policy, or instead arises from an isolated adverse action "not justified or authorized by any preexisting policy." *Dade v. Franklin Cnty.*, No. 2:17-CV-552, 2019 WL 2422247, at *4 (S.D. Ohio June 10, 2019), aff'd sub nom. *Dade v. Baldwin*, 802 F. App'x 878 (6th Cir. 2020).

When the claim is based on an isolated action, such as here, a plaintiff must demonstrate that (1) he was involved in a protected intimate association, and (2) that his "protected conduct was a substantial or motivating factor of the termination." *Hartwell*, 755 Fed. App'x at 479. Causation may be shown through "the temporal proximity between the discovery of protected conduct and an adverse action," *Id*. at 480 (citing *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)), but at the very least, the plaintiff must establish a causal connection between the subjective motivation of the defendant and the termination. *Dade v. Baldwin*, 802 Fed. App'x 878, 882–83 (6th Cir. 2020). If a plaintiff can make such a showing, then a defendant has the burden to prove that it would have fired the plaintiff regardless of the relationship. *Hartwell*, 755 Fed. App'x at 480.

Two cases demonstrate these rules. First, consider the facts of *Hartwell*, where a plaintiff could not demonstrate sufficient causation. There, the Sixth Circuit affirmed summary judgment in favor of the defendants where there was evidence suggesting poor performance by the plaintiff, Ms. Hartwell, and a resistance to feedback, with any "retaliation" centering on "bad behavior"

rather than her intimate association. *Id*. at 480. Ms. Hartwell alleged that her contentious relationship with her husband and his ex-wife, as well as incidents involving her stepchildren who attended Houghton Lake, led the school to reprimand and later fire her. *Id*. at 475–76. However, the court highlighted significant evidence regarding Ms. Hartwell's poor performance, suggesting the motivation for the adverse action was performance-based and not punishment for her intimate association. *Id*. at 479 ("Simply put, Houghton Lake fired Hartwell because she performed poorly inside the classroom and acted inappropriately outside the classroom."). Consequently, no reasonable jury could have found that Ms. Hartwell's intimate associations were a substantial or motivating factor in her termination. *Id*. at 480. The court likewise held that the school could survive a rational basis review, as her intimate association put the school at legal risk and could permissibly be a factor in her termination. *Id*. at 480–81.

Second, consider *Sowards v. Loudon County*. There, the Sixth Circuit allowed an intimate association claim to survive dismissal. In *Sowards*, the plaintiff presented sufficient evidence to permit a reasonable jury to conclude her termination was substantially motivated by her protected association, as she had been a dependable employee and "had never been involved in any serious disciplinary action." 203 F.3d 426, 434 (6th Cir. 2000). Ms. Sowards alleged that her relationship with her husband, who ran against her employer in the primary for County Sheriff, led to her losing her position as a jailer at the Sheriff's Department. *Id*. at 433. The court rejected the defendants' contention that she was terminated for poor performance. *Id*. at 433–34. The court understood the record as evincing an unblemished work history prior to her husband's campaign, which, coupled with the Sheriff's elucidating statements as to her (lack of) political support, demonstrated that her protected intimate association could be found to be a motivating factor in her termination. *Id.* at 433–35.

### B. Whether Katula sufficiently alleged that his relationship was a substantial or motivating factor in the adverse action

Here, Katula's allegation that he was terminated because of his intimate association with a Republican sits somewhere between the factual poles of *Soward* and *Hartwell*. Unlike the plaintiff in *Soward*, there are other explanations for Katula's firing—namely, the April 6 Facebook post. Indeed, the Board and Watkins state that Katula's post was the reason for his termination. (Am. Compl., ECF No. 9, ¶ 29.) Katula acknowledges such reasoning in his complaint, but also adds that, upon information and belief, Watkins "retaliate[d] against him for engaging in an intimate relationship with a member of the Republican Party." (*Id*. at ¶ 31.) This conclusion is drawn from Katula's allegation that Watkins was displeased with his intimate relationship with a Republican and "openly expressed her disapproval" by calling him outside of working hours to interrogate him on the relationship. (*Id.* at ¶¶ 20–21.) However, like the plaintiff in *Hartwell*, significant time elapsed between the discovery of the existence of Katula's protected association and his termination. Indeed, Katula undercuts his own assertion by stating that at all relevant times he had maintained such relationship and that he and Watkins "continued to work at the Board of Elections without incident" until his April 6 post. (*Id*. at ¶ 22.)

Defendants have suggested that Katula was free to intimately associate with any individual, regardless of political affiliation (Answer, ECF No. 12, ¶ 15), but that his "public statements" and "other activities" suggesting a lack of party loyalty were concerning (*Id*. at ¶ 12) and ultimately led to his termination. (*Id*. at ¶ 22.)

Accordingly, whether Katula has carried his low burden of pleading a causal connection between his relationship and his termination is a close call. No adverse actions arose after Watkins learned of the relationship and called Katula to express her disapproval, and the timeline of when such actions occurred during his three-year tenure at the Board are unclear form the pleadings.

17

However, Katula argues that Watkins was "looking for any excuse to terminate him" after learning of his relationship, and that the "benign nature of the April 6 Facebook post" suggests that "it can reasonably be inferred that Watkins had continued to harbor an ongoing resentment towards Katula." (Pl. Resp., ECF No. 14, at PageID # 110, 114.) Further evidence of these assertions may be developed during discovery, and thus judgment on the pleadings is not appropriate.

Drawing all reasonable inferences in Katula's favor at this early stage of litigation, the Court **DENIES** Defendants' Motion regarding Katula's Fourteenth Amendment claim.

### III. Qualified Immunity

A government official performing discretionary functions is shielded from civil liability for damages under the qualified immunity doctrine if their conduct does not violate a clearly established statutory or constitutional right of which a reasonable person would have known. *Heggen v. Lee*, 284 F.3d 675, 686 (6th Cir. 2004) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Courts have traditionally evaluated the application of qualified immunity under a two-step inquiry, *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001), though a court may address the two prongs in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Under the first prong, courts asks whether, in the light most favorable to the plaintiff, the facts alleged demonstrate that the official violated a constitutional right. *Saucier*, 533 U.S. at 201. Under the second prong, the court assesses whether the public official violated a "clearly established" legal rule, such that it would be evident to a reasonable official that the pertinent conduct was unlawful. *Beck v. Hamblen Cnty.*, 969 F.3d 592, 599 (6th Cir. 2020). While the original *Saucier* sequence of analysis—that is, discerning the constitutional right as a threshold matter—may be appropriate to the circumstances, district courts may exercise discretion as to which analysis to address first. *Pearson*, 555 U.S. at 236. Where the resolution of the first prong

18

may depend on a "kaleidoscope of facts not yet fully developed," *id*. at 239, it may prove less cumbersome to address whether there existed a clearly established right at the outset. *See e.g., Lawler v. Hardeman Cnty.*, 93 F.4th 919 (6th Cir. 2024).

Here, as discussed above, both the relevant First Amendment and Fourteenth Amendment violations have delineated contours in case law that would likely give notice to a public official as to what conduct is within the bounds of constitutional permissibility under the second prong. The more difficult inquiry—though dispositive for both parties—is whether Katula can establish a constitutional violation under the first prong of a qualified immunity analysis. Consequently, whether a constitutional right at issue has been violated should be addressed as the first step.

The rights at issue, however, can likely only be determined as a matter of law based on information not currently developed in the record. Because neither constitutional violation can likely be established or dismissed as a matter of law on the pleadings alone, the qualified immunity doctrine would be inappropriate to apply at this stage. The *McCloud* court aptly described this issue:

> It will frequently be possible to find that a governmental defendant who takes an adverse action against a public employee is entitled to qualified immunity because it will be undisputed that the position falls into the category of positions akin to cabinet secretaries, or akin to confidential assistants to cabinet secretaries. When, however, a governmental employee may be nothing more than a supervisor with a glorified title who is simply performing functions over which he or she has no discretion, or no discretion of political significance, then this court cannot grant qualified immunity to a governmental defendant with respect to adverse employment actions taken against such lower-level public employees in an interlocutory appeal such as this. In these circumstances, resolution of the qualified immunity issue will need to await further proceedings.

*McCloud*, 97 F.3d at 1559.

Accordingly, the Court will not find that Watkins is entitled to qualified immunity at this stage.

## CONCLUSION

For the reasons stated herein, the Court **DENIES** Defendants' Motion for Judgment on the Pleadings. (ECF No. 13.)

This case remains open.

**IT IS SO ORDERED.**

**7/11/2024**                                              **s/Edmund A. Sargus, Jr.**
**DATE**                                                               **EDMUND A. SARGUS, JR.**
                                                                                    **UNITED STATES DISTRICT JUDGE**